MAJOR LEAGUE BASEBALL PROP-
ERTIES, INC. and the Office of the
Commissioner of Baseball, Plaintiffs,

v.

OPENING DAY PRODUCTIONS,
INC., Defendant.

Opening Day Productions, Inc.,
Third–Party Plaintiff,

v.

Cotter & Company d/b/a True Value
Hardware, and John Does numbered
1–5, Third–Party Defendants.

No. 96 Civ. 7078(GBD).

United States District Court,
S.D. New York.

Jan. 10, 2005.

Mary L Kevlin, Cowan Liebowitz & Latman, New York, NY, for plaintiffs.

Thomas Arthur Bryan, Hicksville, NY, for defendant.

## MEMORANDUM DECISION & ORDER

DANIELS, District Judge.

Plaintiffs Major League Baseball Properties, Inc. ("MLBP") and the Office of the Commissioner of Baseball ("BOC") bring this action seeking a declaration of noninfringement of the term "opening day." Defendant Opening Day Productions, Inc. counterclaim and filed a third-party complaint against TruServ Corporation (f/k/a Cotter & Company, referred hereinafter as "True Value Hardware"), seeking damages based on the Lanham Act and several state law claims. Plaintiffs' and Third-Party Defendants motions to dismiss certain counterclaims and Third Party claims were previously granted in this action. Defendant's cross motion to stay a determination, pending the registration of the trademark, or in the alternative to dismiss Plaintiffs' request for a declaratory judgment was denied.[1] Plaintiffs now move for summary judgment, pursuant to Fed. R.Civ.P. 56, dismissing defendant's remaining counterclaims and third-party claims and declaring, pursuant to counts one and two of its complaint, that there has been no trademark infringement, breach of contract or misappropriation committed by plaintiffs. Defendant made a cross-motion for summary judgment on the registerability of the mark "Opening Day" and for a declaration that defendant owns the mark "opening day." For the reasons stated below, plaintiffs' motion is granted. Defendant's motion is denied.

## BACKGROUND

Plaintiff MLBP is a New York corporation with its principal place of business in New York, New York. Owned by the thirty Major League Baseball Clubs which comprise the American and National Leagues of Professional Baseball Clubs (the "Clubs"), MLBP serves as the licensing agent for certain aspects of the marketing and merchandising of the Clubs' trademarks. Plaintiff BOC was created pursuant to the Major League Agreement between the Clubs and is located in New York, New York. Third–Party Defendant True Value Hardware is a Delaware corporation with its principal place of business in Chicago, Illinois, and is the owner of the TRUE VALUE trademark.

According to plaintiffs, the term "opening day" has been used "for generations" in connection with Major League Baseball

---

**1.** *See Major League Baseball Properties, Inc., et al. v. Opening Day Productions, Inc. v. Cotter & Company, et al.,* No. 96CV7078, 1997 WL 525482, at *1 (S.D.N.Y. Aug.22, 1997).

games to identify the first game of the regular season and the first home game of the Major League Baseball season for each of the Clubs. Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1, "P. Statement," 5, ¶ 6. Plaintiffs assert that the Clubs "have long used the term 'opening day' to describe and refer to the first game of the Major League Baseball season on a variety of different items commemorating the event." *Id.* at 6, ¶ 8. Moreover, plaintiffs contend that "the use of the name of an event on merchandise commemorating that event is common, and such a practice has been followed long prior to 1990 in connection with merchandise, including clothing, commemorating such Major League Baseball events as the World Series, All–Star Game and Bay Ridge Series." *Id.* at 6, ¶ 9.

Prior to 1990, plaintiffs had relationships with many corporate sponsors to promote opening day. For example, promotional items bearing the sponsors' names have been given away at the opening day games. Several Clubs also had corporate sponsors in connection with "Kids Opening Day," a promotional event scheduled on the Clubs' first Saturday home games of the season. The BOC and MLBP implemented a variety of league-wide corporate sponsorship programs with such companies as Coca–Cola, Chevrolet and IBM.

Plaintiffs maintain that the possibility of conducting a league-wide sponsorship program around the opening day of the Major League Baseball season was "repeatedly discussed" within the BOC and/or MLBP prior to 1990, and was "specifically proposed during that time frame by at least three different companies: Chevrolet, the Walt Disney Company and USA Today." *Id.* at 7, ¶ 13.

Defendant Opening Day Productions, Inc. was formed in 1990 by Dr. Scott Kantro and Greg Buttle. Defendant asserts that in spring of that year, they developed an idea for a line of merchandise that bore the term "opening day" and further developed an idea of a league-wide single sponsor campaign surrounding opening day events. Defendant Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of its Cross–Motion for Summary Judgment, "D. Memo," 3–4. Though defendant believes that the marketing of its line of merchandise would be assisted by the exposure generated by opening day events, it also intended to sell its merchandise under the mark "opening day" year round and not just in connection with opening days.

In July of 1990, defendant approached the MLBP and proposed its idea.[2] According to defendant, the proposal consisted of two components-the first involved

---

2. Defendant states its proposal consisted of the following elements that it alleges were the used by plaintiffs-"(i) Implement a league wide marketing campaign with a single sponsor surrounding the opening day game and series of games of the Major League Baseball season; (ii) Leverage the MLBP trademarks by combining them with Productions' 'Opening Day' mark and the sponsor mark on a variety of merchandise; (iii) Implement a merchandising campaign that would take place prior to and during the opening day series for each Major League team; (iv) Initiate a collection of memorabilia would be sold and/or given by the sponsor and MLBP for after mark and foreign sales commemorating

the opening of the season; (v) Create in-store excitement and customer visits for the sponsor leading up to opening day by use of special coupons, sweepstakes and added value giveaways with each purchase; (vi) Create special, limited edition 'Opening Day' hats, shirts, etc. with the sponsor and MLBP logos applied; (vii) Add regional and local sponsorships to supplement licensing and merchandising applications; (viii) Acquire the new league-wide national sponsor just for opening day and tie it into a national campaign of print, radio, and television advertisements starting approximately 60 days prior to the beginning of the new season." Buttle Aff., ¶¶ 6, 15–16.

using the term "opening day" in conjunction with Major League Baseball marks on defendant's line of merchandise; the second was to create a league-wide campaign for the opening day of baseball utilizing a single corporate sponsor.[3]

The proposal received a "positive reaction" and MLBP's vice president wrote to defendant's attorney on September 27, 1990, to confirm the proposal, which was then further discussed in a draft agreement written by defendant's attorney in response to the letter from MLBP's then vice president. Plaintiffs contend, however, that at the time of these meetings, defendant's idea was "still in the developmental stage" and was "not a 'firm' concept." P. Statement, 10, ¶ 31. Defendant attempted to assert ownership over the right to use the term "opening day" as a trademark and proposed that, together with MLBP, they could market a line of clothing bearing the term "opening day." Defendant further suggested that MLBP conduct a league-wide event surrounding "opening day, opening week or opening months of baseball," sponsored by a single corporation. *Id.* at 10–11, ¶¶ 33–34. During this event, defendant wished to sell its products and the game of baseball would be promoted. The idea for league-wide sponsorship came from defendant company's experience with the National Football League, which had previously conducted "Punt, Pass & Kick" and "Man of the Year" as league-wide, single-sponsor events.

Plaintiffs maintain that defendant did not at any time make a specific proposal as to how its suggested sponsorship would be structured, what the financial aspects of the deal would be, nor what the league-wide event being sponsored would be because defendant "never got to the level of specificity involving the 'nuts and bolts' or logistics of the program." *Id.,* ¶¶ 36–37. Defendant did not suggest specific sponsors to MLBP and "never got to the stage of soliciting any specific sponsors." *Id.* at 12, ¶ 39. Nor did defendant discuss with MLBP specific designs to be used on clothing or accompanied with the term "opening day." Defendant also did not discuss using sponsor identification in conjunction with clothing that bore the term "opening day." Plaintiffs contend that defendant proposed "in general terms that there should be many selling opportunities surrounding its clothing line" that would go beyond the opening day of baseball season and continue year-round. *Id.* at 11, ¶ 38.

There is no evidence that defendant gave MLBP a written proposal detailing its ideas, and one of the owners of defendant company "has been unable to recall anything beyond an oral presentation of Productions' concept." *Id.* at 10, ¶ 32. Furthermore, defendant did not show MLBP any samples of the proposed line of clothing, did not discuss with MLBP the proposed pricing of the clothing or who would manufacture the items, nor how the clothing line would actually be sold to the public. Lastly, plaintiffs argue that defendant never suggested a line of clothing bearing the term "opening day" that would be used as a promotional giveaway item. Indeed, defendant's purpose was to generate revenue as it viewed sale of these items as necessary to the deal it proposed.

On September 27, 1990, MLBP sent defendant's attorney a proposed letter agree-

---

**3.** Plaintiffs contend that they discussed defendant's proposal with representatives from defendant on two occasions without a confidentiality or non-disclosure agreement. Plaintiffs assert that defendant contemplated a confidentiality agreement but concluded that one was unnecessary. Plaintiffs contend that the owners of defendant company "were also themselves familiar with the concept of confidentiality agreements from their prior business experiences." P. Statement, 9–10, ¶ 27.

ment setting forth the terms under which MLBP would give further consideration to the development of defendant's idea. MLBP indicated that it was necessary for defendant to accept the terms contained in the letter.[4] Defendant did not sign the letter, but instead sent MLBP an alternative draft agreement that "purported to declare as confidential any information that might have to be disclosed to MLBP in order for it to further evaluate its interest in Production's proposal." *Id.* at 14, ¶¶ 52–53. MLBP did not sign defendant's draft agreement but rather advised defendant that it was not interested in pursuing further discussions concerning its proposal. No further discussions between the parties have been held.

Plaintiffs contend that the parties never came to terms regarding a governing written agreement on the development of defendant's idea. Plaintiffs assert that there was "never any discussion between the parties as to the amount of compensation Productions might receive because the discussions never advanced that far" and that defendant "did not propose a specific type of arrangement for which compensation could be reasonably calculated." *Id.* at 14–15, ¶¶ 55, 58, at 15, ¶ 59.

In December of 1995, MLBP entered into an agreement, both on its own behalf and as an agent for BOC and the Clubs, with True Value Hardware. By that agreement, MLBP licensed True Value Hardware to use certain marks owned by the plaintiffs and other Major League Baseball entities to represent True Value Hardware as the "Official Hardware Store of Major League Baseball" for a three year period beginning January 1, 1996 and ending on December 31, 1998. Negotiations surrounding this agreement began in 1994 when a representative from Axcess Marketing ("Axcess"), True Value Hardware's marketing agency, contacted a representative from MLBP and expressed True Value Hardware's interest in becoming a Major League Baseball corporate sponsor. The agreement permitted True Value Hardware to participate in a variety of programs throughout the year, including promotions related to the opening day of the Major League Baseball season, and advertising and promotional programs unrelated to opening day.

Plaintiffs claim that Axcess suggested the idea of including the opening day of the season as part of True Value Hardware's sponsorship program. Plaintiffs contend that "[a]t no time during the negotiations of the True Value Agreement did [the representative from Axcess] have any knowledge of any prior proposal made by Productions to MLBP involving any kind of opening day sponsorship program." *Id.* at 17–18, ¶¶ 71, 73–74. Moreover, plaintiffs assert that the MLBP representative also had no knowledge of defendant's prior proposal. "The concept of implementing a

---

4. Among the terms in MLBP's letter to defendant were:

"2. You agree that you do not have a confidential relationship with [Major League Baseball] Properties with respect to your proposal and that Properties shall not be under any obligation to regard your proposal as a secret or prevent disclosure thereof.

3. You agree that Properties shall be the exclusive judge of the utility, novelty and value of your proposal and that no further action need be taken by Properties with respect to your proposal unless we determine to do so.

You acknowledge that Properties is under no obligation to render compensation of any kind following our evaluation of your proposal. You further acknowledge that our consideration of your proposal shall not deprive Properties of any rights that it may enjoy to similar or identical concepts developed within, or used or submitted to, Properties or now or hereafter "existing in the public domain." It also "recited Productions' acknowledgment that its proposal was 'still in the developmental stage.'" *Id.*, 13–14, ¶ 50–51; Kantro Dep. Ex. 8; Kantro Dep, 156.

promotion relating to the opening day of the Major League Baseball season as part of True Value Hardware's sponsorship program was independently developed as a result of [the representative from Axcess'] suggestion, without any reference to or reliance upon any prior proposal made by Productions to MLBP." *Id.* at 18, ¶¶ 74–75.

The agreement provided that True Value Hardware would conduct national promotions surrounding the opening days of the 1996 and 1997 Major League Baseball seasons. In connection with this promotion, baseball caps and baseballs were given away as souvenirs to fans attending the opening day games. They bore a baseball diamond design containing the term "opening day" to designate the opening day of the season between MLBP's silhouetted batter logo and the TRUE VALUE trademark.[5] That design was "independently developed by the Promotion Network, a creative promotional agency based in Dallas." *Id.* at 18–19, ¶ 77–78, 80–81. The program also incorporated advertising and circulars, promotional booklets, sweepstakes games, scoreboard messages, public address announcements and decorative batter circles. No clothing items of any kind bearing the term "opening day" were ever sold to the general public in connection with True Value Hardware's promotions.

Defendant argues that MLBP and True Value Hardware's "opening day" campaign "uses Productions' trademark 'Opening Day' in the framework of its league-wide single sponsor concept." D. Memo at 5. Defendant states that it made use of the mark "opening day" "on a variety of clothing on a test basis." D. Memo at 28. Defendant argues, moreover, that it "test marketed its clothing in approximately one dozen states and sold thousands of dollars worth of clothing, right up to the point that MLBP and BOC attacked it." Defendant Memorandum of Law in Reply and in Further Support of It's Cross–Motion, "D. Reply," at 7. It is undisputed, however, that these test market sales were the only sales that defendant made of any clothing bearing the term "opening day." Three hundred sixty items of clothing were shipped in October or November of 1996 through a distributor named Wild Oats that generated approximately $3,000.00 in total sales. Furthermore, prior to December 1996, defendant decided to halt future production or shipping of clothing, choosing instead to concentrate on its lawsuit with MLBP. Defendant's line of clothing bearing the term "opening day" is not currently offered for sale, and there are no plans for future sales. Plaintiffs argue, therefore, that "[t]here is presently no public awareness of Productions, and the public does not identify the term 'opening day' with Productions' line of clothing." *Id.*, ¶ 66.

Defendant filed its first intent to use application for "opening day" on August 31, 1990, for International Classes 16, 18, 20, 25 and 28, which, as amended, was published for opposition on April 21, 1992. No opposition was filed and on July 14, 1992, the Trademark Office filed a Notice of Allowance. Defendant argues that "[n]otably, MLBP and BOC were specifically told of that application and chose not to oppose because, as the former President and CEO of MLBP testified, MLBP knew it had neither grounds for opposition or that an opposition would be successful." D. Memo at 5.[6] On March 5, 1993, a

---

**5.** The silhouetted batter logo is owned by MLBP and "is a well recognized symbol among the public." *Id.* at 19–20, ¶ 83.

**6.** Specifically, defendant points out that in deposition, the former president of MLBP testified that "we were substantially convinced that [defendant] had a proprietary right there." D. Memo, 5.

twelve-month extension of time to file a Statement of Use was granted by the Trademark Trial and Appeal Board ("TTAB") commencing with the Notice of Allowance date.

Defendant claims that while acting without counsel, it erroneously calculated the date by which it had to file a Statement of Use and that therefore, it inadvertently abandoned its first application. Upon learning of this error, defendant filed another intent to use application for International Class 25 (clothing) on April 15, 1994, which was then published on January 25, 1995, and to which MLBP and the BOC commenced an opposition proceeding on May 5, 1995. During the TTAB proceeding, defendant filed a motion for summary judgment, to which defendant argues MLBP and the BOC "pulled a fast one" in filing the instant litigation as opposed to filing their responsive papers, so as to "prevent further review by the TTAB." *Id.* at 6. Defendant states that the instant litigation has come "at a great cost to Productions' business." *Id.*

On April 15, 1994, defendant filed an intent to use application in the U.S. Patent and Trademark Office to register the term "opening day" for clothing items. Plaintiffs were concerned that the issuance of a registration for the term "opening day" would interfere with or restrict their ability to continue their use of that term in connection with Major League Baseball exhibitions and products decorated to celebrate the opening day of the Major League Baseball season. Therefore, the BOC opposed defendant's application in the TTAB because "the term 'opening day' is generic, merely descriptive or ornamental and, in the alternative, that the term has been previously used by Major League Baseball entities." P. Statement at 20–21.

Prior to the opening day of the 1996 Major League Baseball season, and while the BOC's opposition proceeding was pending, defendant objected to the use of the term "opening day" in connection with True Value Hardware's Major League Baseball sponsorship, and demanded that MLBP cease using that term. Defendant threatened to file suit if the term was used on any clothing items, to which MLBP asserted that "it had made extensive use of the term over many decades to describe and refer to the start of the Major League Baseball season." P. Statement at 21, ¶¶ 89–90. After several months of discovery in the TTAB proceeding, defendant wrote to plaintiffs on September 3, 1996, and threatened to file suit. Plaintiffs responded by filing the instant lawsuit on September 17, 1996 for declaratory relief. Because the instant action encompassed the trademark issues in dispute in the TTAB proceeding, and in order to allow all disputed issues to be adjudicated in one proceeding, the BOC moved to stay the TTAB proceeding pending the resolution of the instant case, which was granted.

Plaintiffs state that "[a]t no time in any of Productions' discussions with the various business entities it was pursuing did anyone ever refuse to deal with Productions (or otherwise express any concern) because it did not have a federal trademark registration or because it was involved in any proceeding with MLBP or the BOC." P. Statement at 22, ¶ 91–94.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). A dispute regarding a material fact is genuine if a verdict at trial could

reasonably be returned for the non-moving party. *See Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir.2000). The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1994). The burden of demonstrating that summary judgment should be granted is significant in that summary judgment is a "drastic devise, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir.1999), quoting *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

## A. *Trademark Infringement*

Defendant argues that in utilizing the term "opening day," plaintiffs have infringed defendant's trademark to that term. Plaintiffs contend that they are entitled to summary judgment on defendant's trademark infringement claim because: defendant has not made sufficient use of the term "opening day" so as to create trademark rights to the term; plaintiffs' use of the term in connection with the first day of games of the Major League Baseball season is a descriptive fair use under Section 33(b)(4) of the Lanham Act; and even if defendant could establish a proprietary right to the term "opening day," plaintiffs' use of the term in connection with products and promotions relating to the opening day of the baseball season does not, as a matter of law, create a likelihood of confusion with defendant's use of the term on clothing.

■ The term "opening day" is not a registered trademark. As the Supreme Court has stated, "it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (*cited in Talk To Me Products, Inc. v. Larami Corporation*, 804 F.Supp. 555, 558 (S.D.N.Y.1992)). Section 43(a) of the Lanham Act provides a cause of action against

any person, who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(1)(a). The Lanham Act defines "use in commerce" as

the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. [A] mark shall be deemed to be in use in commerce ... on goods when ... it is

placed in any manner on the goods ... or the displays associated therewith or on the tags or labels affixed thereto ... and the goods are sold or transported in commerce.

15 U.S.C. § 1127.

In order to prevail on a Lanham Act infringement claim, a party must satisfy two elements: it must show that "it has a valid mark entitled to protection and that the [infringer's] use of it is likely to cause confusion." *Morningside Group Ltd. v. Morningside Capital Group*, 182 F.3d 133, 137 (2d Cir.1999) (internal citation and quotations omitted). Therefore, a party carries the initial burden of demonstrating that the mark is entitled to Lanham Act protection. "[T]he right to a particular mark grows out of its use, not its mere adoption." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *see also Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir.1998). Moreover,

> [u]nder familiar trademark principles, the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace. The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.

*LaSociete Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974).

Furthermore, because "the right to a particular mark grows out of its use, ... [t]o prove bona fide usage, the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Id.*, at 1271–72; *see also Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315–16 (3d Cir.1999); *Larsen v. Terk Techs. Corp.*, 151 F.3d 140,

146 (4th Cir.1998). The Second Circuit has held that

> [t]rademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must be a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade. Absent these elements, no trademark can be created or exist.

*LaSociete Anonyme*, 495 F.2d at 1274 (citation omitted); *see also Windows User, Inc. v. Reed Business Publishing, Ltd.*, 795 F.Supp. 103, 108 (S.D.N.Y.1992) ("The talismanic test is whether or not the mark was used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.") (internal quotations and citation omitted); *see also D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1270–71 (S.D.N.Y.1969) ("The mark must be so used that it comes to the attention of wholesale or retail purchasers in association with, and as a means of identifying, the product.... First user does not refer to the party who was prior in time, but 'first in the specific trade.'") (citations omitted).

Defendant in the present case cannot show that its use of the mark "opening day" is entitled to trademark protection under § 43(a) of the Lanham Act. Defendant fails to make the threshold showing of sufficient use of the mark "opening day" in commerce that would entitle it to Lanham Act protection. Prior to the True Value opening day sponsorship program, the only evidence of defendant's use of the mark "opening day" is a single invoice for fifty shirts sold by defendant to an entity named Ferons in August 1991 for a total of $300.00. *See* Buttle Dep. at 174–78, Ex. 45. In deposition, one of the owners of defendant company could not say whether

or not Ferons had ever sold these shirts to the general public. *See id.* at 177.

In October/November 1996, subsequent to the True Value Hardware opening day sponsorship program and the institution of the present litigation, defendant shipped approximately 360 items of clothing, generating revenues of just over $3,000.00 in total sales. *See* Klever Dep. at 56–57, 97; Buttle Dep. at 166–67, 169–70; Ex. 49. A few months after those shipments were made, defendant decided to halt further sales, marketing and promotion of clothing bearing the mark "opening day," and there is no evidence of any further sales or plans of future sales. (*See* Buttle Dep. at 167; *see also* Klever Dep. at 51, 101–02). Defendant itself states that it made use of the mark "opening day" "on a variety of clothing on a test basis." D. Memo at 28; *see also* Buttle Dep., 166–170. Further, defendant argues that it "test marketed its clothing in approximately one dozen states and sold thousands of dollars worth of clothing, right up to the point that MLBP and BOC attacked it." D. Reply at 7.

The right to a particular mark grows out of its use, and defendant cannot show that its use of the mark "opening day" was "deliberate" and "continuous." Instead, its use is what would be termed "casual and transitory" and lacking in the "active and public attempt to establish a trade" in the mark. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1400 (3d Cir.1985) (no establishment of trademark rights by defendant's "de minimus" sales, which the court defined to be gross sales of less than $5,000.00, to less than 50 customers for any state in at least two of three years for which there was data) (*cited in Momentum Luggage & Leisure Bags v. Jansport, Inc., et al.,* No. 00 Civ. 7909, 2001 WL 830667, *7 (S.D.N.Y. July 23, 2001), *aff'd,* 45 Fed.Appx. 42 (2d Cir.2002)).

Moreover, defendant cannot show that consumers have come to identify any "opening day" products with defendant. Indeed, both owners of defendant company stated that they do not believe that the public identifies the mark "opening day" with defendant's clothing line. *See* Buttle Dep. at 272; *see also* Kantro Dep. at 116. "[T]he talismanic test is whether or not the mark was used 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Windows User, Inc. v. Reed Business Publishing, Ltd.,* 795 F.Supp. 103, 108 (S.D.N.Y.1992) (citation omitted). Defendant has failed to make this showing.

Furthermore defendant cannot establish that MLBP's and True Value Hardware's use of the term "opening day" in connection with the sponsorship program resulted in a likelihood of confusion between defendant's mark and plaintiffs' use of the term. In order to trigger liability under § 43(a) of the Lanham Act, it is sufficient for defendant to show that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of plaintiffs' mark. *See Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 354 (internal citation omitted).

■ In order to establish that there is a likelihood of confusion, this Court must look to the following factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). These factors are: (1) the strength of the defendant's mark; (2) the degree of similarity between the parties' marks; (3) the competitive proximity of the parties' products; (4) the likelihood that the defendant will "bridge the gap" and offer a product like plaintiffs'; (5)

actual confusion between the products; (6) good faith on plaintiffs' part; (7) the quality of plaintiffs product; and (8) the sophistication of buyers. This list is not exhaustive nor is one factor dispositive. "Instead, each factor must be considered in the context of others, and balanced to determine whether a likelihood of confusion exists." *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 580 (2d Cir. 1991).

■ The evidence before this Court demonstrates that defendant's mark is not strong. There is no evidence that the public identifies the term "opening day" with defendant or defendant's line of clothing. Indeed, the minimal nature of defendant's sales to date and the common usage of the term "opening day" to refer to the first day of a sports season tips this factor in plaintiffs' favor. *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir.1997)(reversing the district court's finding that plaintiff's mark was moderately strong as clearly erroneous where plaintiff conceded that prospective purchasers did not associate the term with plaintiff and the mark is not wholly original).

Defendant argues that the degree of similarity between the parties' marks in undisputed. "The two marks are identical: 'Opening Day.'" D. Reply at 9. Plaintiffs' use of the Major League Baseball silhouetted batter logo and the True Value name and mark along with "opening day," however, distinguishes their mark from defendant's and conveys a different impression than defendant's use of the term "opening day" by itself. *See Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576 (2d Cir.1991)(finding that although both parties use an identical term as the focal point, these similarities do not create an issue of fact on the likelihood of confusion given that other factors, i.e. different typeface and different included terms, create a general impression conveyed to the public

that these designations differ significantly).

The third factor, competitive proximity, does not support defendant's claim. Plaintiff's product was used on promotional giveaways and distributed at Major League Baseball stadiums in connection with the opening day of the season. The fact that both parties use the term is insufficient to find competitive proximity. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 396–97 (2d Cir.1995)(finding that district court erred in finding proximity between products because they are both staplers and sold in the same stores); *see also Lang*, 949 F.2d at 582(finding that although Lang's publishing house and defendant's magazine are in the field of publishing, this does not render them proximate).

Plaintiffs' hats and baseballs were part of a promotional giveaway. Despite defendant's argument that plaintiffs' goods fall into in one of their targeted markets: in stadium sales, based on these facts, there is very little likelihood that the defendant will bridge the gap and offer a product like plaintiffs'. Defendant's belief that it will bridge the gap and sell its product in a manner similar to plaintiffs' is wholly speculative given MLBP's and the clubs exclusive control of such activities.

Defendant has further provided insufficient evidence of actual confusion among the consuming public at large. It's argument that "Mr. White [MLBP's former president] testified that he was confused as to the origin of the goods" is insufficient to tip this factor in defendant's favor. The Lanham Act seeks to prevent consumer confusion that enables a seller to pass "off his goods as the goods of another." *Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1132 (S.D.N.Y.1977) (quoting *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863

(S.D.N.Y.1962), aff'd, 312 F.2d 125 (2d Cir. 1963)). There is no evidence, in this record, of actual consumer confusion that enabled plaintiffs, who gave their items away during promotional distributions, to pass off their goods as defendants.

The "good faith" factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Edison Brothers Stores, Inc. v. Cosmair, Inc.,* 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987). Defendant has presented no evidence to demonstrate that plaintiffs adopted its mark with the intention of capitalizing on defendant's reputation and goodwill. The term opening day is undisputably used to describe the first day of the baseball season. Plaintiffs' mark, which appeared on promotional items that were distributed free of charge to fans who attended opening day games was not adopted to capitalize on defendant's reputation and goodwill. Indeed, as plaintiffs' argue, there is no evidence that defendant has any reputation or goodwill upon which they could possibly have hoped to capitalize. Defendant's argument that plaintiffs were aware of their mark is not dispositive and does not give rise to a necessary inference of bad faith, "because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith." *Lang,* 949 F.2d at 583–84 (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)).

There is no dispute as to the quality of plaintiffs' product. This factor, therefore, does not support a finding of likely confusion.

In order to assess the sophistication of buyers, a trial court must consider the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue. *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 746 (2d Cir. 1998). Any lack of sophistication here, however, could not contribute to confusion between the two products. Plaintiffs' product was distributed for free at major league stadiums at the start of the season. The sophistication of buyers, therefore, does not support a finding of likely confusion.

In sum, consideration of the relevant *Polaroid* factors compels the legal conclusion that defendant failed to raise a genuine issue of material fact on the existence of a likelihood that plaintiffs' use of its term "opening day" will confuse reasonably prudent consumers. Accordingly, Plaintiffs' and Third–Party Defendant's motion for summary judgment on defendant's seventh counterclaim and second claim of the Third Party Complaint for trademark infringement is granted.

### B. *Unfair Competition*

▮ "The standard of unfair competition under New York law is a virtual cognate of the federal Lanham Act and is predicated on the theory of the misappropriation of a claimant's commercial goodwill." *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano,* 331 F.Supp.2d 247, 255 (internal citation omitted). The essence of both sources of protection is the likelihood that a consuming public will be confused about the source of the allegedly infringing product. *See American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 664 (2d Cir.1979). Under New York law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploi-

tation of proprietary information or trade secrets. *See Eagle Comtronics, Inc. v. Pico Products, Inc.,* 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't.1998).

In order for defendant to succeed in demonstrating unfair competition under both the Lanham Act and the common law, defendant must show a likelihood of confusion or deception of the consuming public as to the source of the allegedly infringing product and bad faith on the part of plaintiffs. *See Tri–Star,* 14 F.Supp.2d at 363–64. As it has already been concluded that there is no likelihood of confusion among the purchasing public and that there is no evidence that the plaintiffs acted in bad faith in using the term "opening day," defendant fails to meet its burden to show unfair competition. Defendant's second counterclaim and third claim of the Third Party Complaint for unfair competition is dismissed.

## C. *Fraud*

Plaintiffs argue that defendant's fraud counterclaim must be dismissed because, among other things, plaintiffs did not use any proprietary idea that defendant suggested. Rather, plaintiffs contend that they independently developed their own concept for the True Value sponsorship program. They further argue that defendant cannot show that it justifiably relied on a material false misrepresentation made by MLBP. Defendant disputes who created the concept of the league-wide single sponsor campaign and claims that plaintiffs' alleged bad faith filing of the opposition proceeding and the present litigation supports its claim.

■ In order to state a claim for fraud, four elements must be shown: that there was "(1) a misrepresentation or a material omission of fact which was false and known to be false by [plaintiff]; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other

party on the misrepresentation or material omission; and (4) injury." *G&R Moojestic Treats, Inc., et al. v. Maggiemoo's International, LLC,* No. 03Civ10027, 2004 WL 1110423, *9 (S.D.N.Y. May 19, 2004) (*quoting Flash Electronics, Inc. v. Universal Music & Distribution Corp.,* 312 F.Supp.2d 379, 402 (E.D.N.Y.2004); *see also AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 208 (2d Cir.2000)). All four elements must be established in order for the party asserting the claim to prevail. *See Coleco Industries, Inc. v. Universal City Studios, Inc.,* No.84Civ2596, 1986 WL 1809, *8 (S.D.N.Y. Feb.3, 1986).

■ Defendant cannot show that it justifiably relied on any alleged misrepresentation made by plaintiffs. Defendant bases its fraud claim on the deposition testimony of MLBP's former president. He testified about MLBP's corporate policy of refusing to enter into confidentiality agreements. He stated that "if someone brought to [MLBP] what they positioned as an original idea, [MLBP] would, without fail, respond that baseball had, in fact, developed many ideas on their own, that [MLBP] had engaged in discussions of many more ideas and that under no circumstances [was MLBP] acknowledging that there is anything such as an idea that was owned by someone else." D. Memo at 13–14. However, defendant offers no evidence that it relied on any material misrepresentation made by MLBP.

Defendant further argues that MLBP fraudulently denied the merit of the proposals that defendant presented, and that MLBP refused to enter into a confidentiality agreement with defendant regarding such proposals so as to claim the benefit of those proposals for itself. Plaintiff argues, however, that defendant cannot show that it relied on any allegedly fraudulent statements prior to disclosing its proposal. P.

Memo at 18. They contend that prior to disclosing their proposal to MLBP, defendant "made the deliberate and informed decision not to seek any confidentiality agreement." *Id.; see also* Buttle Dep at 150–52, 154–55. Moreover, plaintiffs argue that "MLBP did not induce Productions to disclose any of its ideas to MLBP, and MLBP did not refuse to sign a confidentiality agreement with Productions before it commenced discussions with Productions." P. Memo at 18; Buttle Dep. at 156, 160. Plaintiffs also claim that the owners of defendant company were both "sophisticated businessmen who had prior experience with the concept of confidentiality agreements in the context of intellectual property rights." They were being advised by a law firm that practiced in the intellectual property field at the time that defendant made its proposal to MLBP. *See* P. Memo, 18; *see also* Kantro Dep., 15, 17–19, 27–30, 32–33, 36–37, 193–94; *see also* Buttle Dep., 151–55. Defendant proffers no evidence of a material misrepresentation or its justifiable reliance.

Accordingly, defendant's fraud counterclaim is dismissed.[7]

### D. *Bad Faith/Opposition/Fraud*

 Defendant's bad faith/opposition/fraud counterclaim is based on defendant's allegation that plaintiffs filed the opposition proceeding and the instant lawsuit in bad faith. Plaintiffs argue that defendant's bad faith/opposition/fraud claim be dismissed because defendant has not suffered any cognizable damage, and because defendant's allegations of wrongdoing do not constitute a proper basis for a

fraud claim. In the opposition proceeding, under 15 U.S.C. § 1063, plaintiffs have the option to file an opposition or intervene in the registration of a trademark. The statute states that "[a]ny person who believes he would be damaged by the registration of a mark ... [may] file a verified opposition in the Patent Office stating the grounds therefor ..." 15 U.S.C. § 1063. In this case, plaintiffs were merely taking an action that they are statutorily permitted to do. In regards to the present litigation, the Court finds no evidence that it was brought to harass defendants or for other improper reasons. The Court finds no evidence that it is devoid of any factual basis, or that it is frivolous or without any foundation. Further, as plaintiffs point out, they filed the instant lawsuit on September 17, 1996, for declaratory relief in response to a letter that defendant wrote to plaintiffs and third-party defendant on September 3, 1996, threatening to file a suit seeking $40 million dollars in damages unless it was contacted within 10 business days, to which plaintiffs responded by filing the instant lawsuit on September 17, 1996. *See* P. Statement at 21–22, ¶¶ 91–92; *see also* Candido Dec. ¶¶ 6–7.

Defendant's fifth counterclaim for bad faith/opposition/fraud is therefore dismissed.

### E. *Breach of Contract*

 Plaintiffs argue, among other things, that there was never any valid contract between them and defendant because there was never any agreement as to the material term of compensation. "Un-

---

7. Similar to their arguments regarding plaintiff's unfair competition claim, the parties also contest the novelty and concreteness of defendant's ideas. It is unnecessary to determine if genuine issues of material fact exist regarding whether defendant's ideas were novel or concrete, whether plaintiffs used any of defendant's proprietary ideas in developing their sponsorship campaign, and whether plaintiffs independently created the ideas behind their sponsorship campaign. Plaintiff is entitled to summary judgment on defendant's fraud claim because defendant cannot show that it justifiably relied on a material false representation made by MLBP.

der New York law, an agreement is enforceable if a meeting of the minds has occurred as to the contract's 'material terms'."[8] *Michael Coppel Promotions Pty. Ltd. v. Bolton,* 982 F.Supp. 950, 954 (S.D.N.Y.1997) (citing *Four Seasons Hotels Ltd. v. Vinnik,* 127 A.D.2d 310, 317, 515 N.Y.S.2d 1, 6 (1st Dep't 1987); *Missigman v. USI Northeast, Inc.,* 131 F.Supp.2d 495, 506 (S.D.N.Y.2001)) ("If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."). Price or compensation are material terms in a contract requiring definiteness. *See Cooper Square Realty, Inc. v. A.R.S. Mgmt. Ltd.,* 181 A.D.2d 551, 551, 581 N.Y.S.2d 50 (1st Dep't 1992). Moreover, a future agreement to agree on compensation is too indefinite for enforcement. *See Ellenberg v. Schneider,* 109 Misc.2d 1058, 1063, 441 N.Y.S.2d 581 (N.Y.Sup.Ct. 1981); *see also Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109–10, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981) ("[I]t is rightfully well settled in the common law of contracts ... that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.").

Plaintiff contends that MLBP did not agree to compensate defendant for defendant's proposals and that the parties never reached an agreement as to what the amount of compensation would be P. Memo at 22. They point to the deposition testimony of defendant company's owners as evidence of this lack of agreement. Specifically, in response to the question on what basis he would be compensated, one of the owners stated that "I don't think that was directed [sic] because at the time there was such a wide scale opportunity that who knew how much money they could make from this. There wasn't a specific I'll give you a dollar amount or I'll give you 22 years or forever, in remuneration." Buttle Dep. at 107–108. Further, when asked if the parties had any discussions as to how defendant would be compensated, he stated that "[t]he discussions didn't get to that." *Id.* at 113. Another owner stated that "[t]here was never any agreement as to [compensation]." Kantro Dep. at 217.

Plaintiffs further contend that defendant did not at any time propose to MLBP the amount that defendant was to be compensated, and that in fact, defendant contemplated an agreement in the future that would spell out such compensation. *See* P. Memo at 22–23; *see also* Buttle Dep. at 112–13, 147. In response to defendant's claim that the parties agreed that the amount of compensation was to be based on "industry standards," Defendant's Answer and Counter–Claims, ¶ 32, plaintiffs argue that "there is simply no evidence to support that assertion." P. Memo at 22.

Defendant contends that MLBP's former president stated that defendant would be compensated if defendant's proposals were used. Defendant's Response to Rule 56.1, ¶¶ 55–56. Specifically, defendant points to testimony by one of defendant's owners, where in response to the question "You are saying that somebody actually said we'll compensate you at one of the two meetings you were at?" he replied, "Rick White said that." Buttle Dep. at 108. Defendant further offers an affidavit from MLBP's former president in which he states that "[i]t is fair to say that based on our discussions, Productions could justifiably rely on MLBP to compensate Productions if MLBP used Production's proposal,

**8.** Because the parties have failed to articulate the state law under which they pursue their breach of contract claim, this Court adopts New York law as was previously used in adjudicating the parties other state law claims in the prior action. *See Major League Baseball,* 1997 WL 525482 at *5.

even in the absence of a confidentiality agreement." White Aff., ¶ 9. He further stated that *"[i]f we had completed a deal while I was at MLBP, the compensation for Productions' proposal would have been twofold.* On merchandise where we co-mingled Productions' property rights with those of MLBP, *we would have split revenues* on those premiums. In addition to secure rights to produce merchandise *we would have compensated Productions* for the overall marketing proposal with a fee for the marketing campaign." *Id.,* ¶¶ 10–12. (Emphasis added). The subjunctive phrasing of defendant's comments regarding compensation are too indefinite to support a conclusion that compensation, or any other specific terms of an enforceable agreement, was agreed upon by the parties.

Based on the foregoing, there was never a meeting of the minds between the parties. Therefore, plaintiffs' motion for summary judgment on defendant's first counterclaim for breach of contract is also granted.

### F. *Defendant's Motion for a Declaratory Judgment*

Defendant also moves for summary judgment on the registerability of the mark "opening day" and otherwise declaring that defendant owns the mark "opening day."

██ Whether a mark qualifies for § 43(a) protection depends on its classification within the system established by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). *See Talk To Me Products, Inc. v. Larami Corporation,* 804 F.Supp. 555, 562 (S.D.N.Y.1992). That system incorporates four classes of marks, in ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch,* 537 F.2d at 9. Suggestive and arbitrary marks are considered "inherently distinctive and entitled to protection" due to the fact that "their intrinsic nature serves to identify a particular source of a product." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Therefore, they are "automatically protected" without a showing of secondary meaning. *Lane Capital Management v. Lane Capital Management,* 192 F.3d 337, 344 (2d Cir.1999). A generic mark can never be protected, but a descriptive mark is eligible for protection if it has acquired secondary meaning. *Id.* Therefore, a descriptive mark must have become distinctive of the particular producer's goods in commerce. *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753. Secondary meaning attaches to a mark when "a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved ... as indicative of an association with a specific entity." *Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1343 (2d Cir.1992) (citation omitted).

The parties are in dispute as to how to characterize the mark "opening day." Plaintiffs argue that the mark is descriptive while defendant argues that the mark is arbitrary. The Second Circuit characterizes a descriptive mark as one that "'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'" *Abercrombie & Fitch,* 537 F.2d at 11 (citation omitted). "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." *20th Century Wear v. Sanmark–Stardust,* 747 F.2d 81, 88 (2d. Cir.), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). On the other hand, with arbitrary marks, "inventiveness and ingenuity leap beyond mere suggestiveness, dispensing with any effort to identify the product through its name ... Arbi-

trary marks employ common words in uncommon ways. New fanciful words and terms are not real words at all, but are coined and applied in a unique, unfamiliar usage for the express purpose of serving as a trademark to be attached to a particular product, but bearing no identifying trace to the product or source." *BigStar Entertainment, Inc. v. Next Big Star, Inc., et al.,* 105 F.Supp.2d 185, 197 (S.D.N.Y.2000)(stating that there was nothing "rare or inventive" about the plain words comprising "BIGSTAR," that "they [are not] suggestive as used in reference to products offered in the entertainment industry," and finding that the mark "BIGSTAR" is descriptive rather than suggestive or arbitrary). *Id.* 105 F.Supp.2d at 199.

██ In assessing a mark, a "[court] must be mindful that '[t]he focus in categorizing a mark is on how the words are used in context rather than their meaning in the abstract.'" *Talk To Me Products,* 804 F.Supp. at 562 (*quoting Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992))(finding that the term "Soaker," in the context of a water gun, describes "an essential 'purpose or utility' of the product" and is therefore a descriptive mark and stating, in dicta, that this finding is reinforced by the concern that " 'exclusive use of the term might unfairly "monopolize" common speech' "). *Id.,* at 563 (*quoting Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1342 (2d Cir. 1992)) (citation omitted). While "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used for apples." I J.T. McCarthy, "Trademarks and Unfair Competition," § 11:22, at 498–99 (2d ed.1984) (*quoted in Bristol–Myers,* 973 F.2d at 1041).

██ The term "opening day" is proposed by defendant to be used on merchandise in connection with the opening day of the baseball season. As it was used, it is a descriptive mark, rather than one that could be classified as arbitrary. As was found in *BigStar,* there is nothing rare or inventive about using the term "opening day" in the context of the opening day of the baseball season. The term does not leave much to the imagination. It does not require much thought be used in identifying its source or utility. When used on merchandise in the context of baseball, the mark "opening day" is not unexpected, and easily relates to the industry in which the merchandise is being offered. Further, as with the term "big star," the term "opening day" is comprised of ordinary words that exist in the public domain. As plaintiffs highlight, the term had been used before defendant made its proposal to MLBP. "[I]t is therefore more predictable that another would in good faith use the name and also diminishes [defendant's] reasonable expectation of exclusivity." *BigStar,* 105 F.Supp.2d at 201. Lastly, the term "opening day" is commonly used, and finding that it is descriptive in the context that it had been proposed and used is reinforced by the concern that " 'exclusive use of the term might unfairly "monopolize" common speech' " *Talk To Me,* 804 F.Supp. at 563 (*quoting Bernard v. Commerce Drug Co.,* 964 F.2d 1338, 1342 (2d Cir.1992)) (citation omitted).

Since "Opening day" is a descriptive mark, defendant must show that it has acquired secondary meaning in order for it to be entitled to Lanham Act protection. Defendant must therefore show that "Opening day" has become distinctive of it's particular goods in commerce, *see Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753, and that "a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved . . . as indicative of an association with a [defendant's] entity."

**274**

*Bernard,* 964 F.2d at 1343 (citation omitted). Secondary meaning attaches when "it [is] shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer." *Best Cellars, Inc. v. Grape Finds at Dupont, Inc., et al.,* 90 F.Supp.2d 431, 455 (S.D.N.Y.2000) (*quoting Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987)) (internal quotations omitted) ("The crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods ...").

Defendant cannot make this showing. Defendant has not offered any evidence that its goods have acquired secondary meaning in the marketplace. Consumers have not come to identify "opening day" products with defendant. In fact, both of the owners of defendant company stated in deposition that they do not believe that the public identifies the mark "opening day" with defendant's clothing line. *See* Buttle Dep., 272.

Defendant's motion for summary judgment on the registerability of the mark "opening day," and otherwise declaring that defendant owns the mark "opening day" is hereby denied.

### *CONCLUSION*

For the reasons stated above, plaintiffs'/third-party defendant's motion for summary judgment dismissing all of defendant's remaining counterclaims and third-party claims and awarding plaintiffs declaratory relief on counts one and two of their complaint is granted. There has been no trademark infringement, breach of contract or misappropriation by plaintiffs as a result of its opening day promotions and sponsorships. Defendant's motion for summary judgment on the registerability of the mark "opening day" and otherwise declaring that defendant owns the mark "opening day" is denied.